The first case this morning is 075-103, Jacobs Engineering v. United States. Mr. Simon. Thank you, Your Honor. May it please the Court? Two years ago, I was before two of the members of the panel here, arguing on behalf of Jacobs a very similar issue. Jacobs had a cost-sharing contract with the Department of Energy for research and development related to a coal gasification facility. And at that time, we argued that because the government elected to terminate for convenience that contract because of funding limitations, that the cost-sharing provisions of that contract should not apply. This Court, citing the all-cost reimbursable language of FAR 52-249-6, agreed that the cost-sharing was not contemplated in terms of that provision and similarly cited the underlying equitable principles of the termination for convenience clause. So you won that case on the grounds that you urged the Court to adopt? Yes, Your Honor. But in the course of that appeal, you said that you weren't pressing the claim for fee, which had been rejected by the CFC. Fee in terms that cost-sharing applied. In other words, I had a claim that I was still entitled to fee even if cost-sharing applied because we felt that the Department of Energy, by paying foregone fee, had waived any defense that they were not or did not have to compensate us for fee. Well, as I read your brief, there wasn't any such qualification on your expression of waiver of your objection to the denial of fee. You simply said we're not pressing the argument for fee. And if you review the CFC decision, they rule against me that my argument that the OE had waived the fee provision, they did not adopt. And that was my argument. I never argued, because I never knew it was at issue, that if cost-sharing did not apply, that the no fee of cost-sharing would similarly apply, because that was never at issue. If you look at the contracting officer's final decision in this case, you'll see that when we claimed $7 million, that $7 million figure included fee. And the contracting officer said in his final decision that's in the joint appendix at page 54 that cost-sharing applies and the no fee of cost-sharing applies. So we're only going to give you 80% of that $7 million, which included fee. And when we appealed to the Court of Federal Claims, we argued that cost-sharing did not apply, and we were entitled to 100% of that. And I also argued alternatively – And you could have pressed that argument before us in the first appeal with respect to both the cost-sharing and the fee. I could have, but it would have been futile. It would have been like arguing that payment was in dispute. There was no issue over the payments. There was no issue in my mind that if cost-sharing did not apply, I was entitled to that full $7 million. I never found out that the government was of the position that if cost-sharing did not apply until remand. And when we went back and said total cost of performance or $7 million, which included the fee, everybody always agreed that that was the total amount of performance costs. And we should have been entitled to 100% of that. It was at that time that the government said, no, you don't get fee because of this cost-sharing no fee provision. Mr. Simon, with respect to the fee provision, which according to the government was not appealed after the first CFC decision, if there was no cost-sharing arrangement, you get the whole $7 million, right? That's my position. With the cost-sharing arrangement, you only get 80% of that. Correct. Does that mean that the fee is also reduced by the 20%? What was odd about this contract is that there was this no fee provision for cost-sharing. But there was a DOE regulation that allowed the contractor to add its fee to its cost of performance. And then the government would pay 80% of that amount. But that would be for full performance. Yes. And that's my whole argument here is we never got to fully perform the contract and benefit from our bargain. We gave up fee. We gave up this cost-sharing provision to get the benefit of the bargain, which was advanced patent rights. We had to fight and get an option period up front just to get our subs on board. Who wants a deal where you pay 20% of the cost with no fee if the party you're contracting with has the opportunity to terminate it? Go ahead. But wasn't that part of the consideration that you were giving at that time? You went into the cost arrangement specifically for the benefits at the tail end of the patent rights, if any, that were developed in the contract. That's correct. That was the benefit of the bargain were the patent rights. But that was your consideration for the lack of the fee during that time period, though, wasn't it? Yes. So if you gave that up at the beginning, why are you trying to claim it now then? It's the same issue as cost-sharing. The benefit or the quid pro quo, advanced patent rights was the quid, and the quo was we give our rights up to recover 20% of the cost as well as fee. If you look at 16303, which is a definition of a cost-sharing contract, it says a cost-sharing contract may be used when the contractor agrees to absorb a portion of the cost in the expectation of substantial compensating benefits. And part A describes a cost-sharing contract as a cost reimbursement contract in which the contractor receives no fee and is reimbursed only for an agreed-upon portion of the allowable cost. And here it was 80% of the cost we would accept and we would get no fee. Well, now, in the first opinion of the Court of Federal Claims, the Court of Federal Claims judge explained that, as he understood the arrangement, that the cost in the shared cost arrangement, the cost that you were being reimbursed actually included, in effect, fee. And it was referred to by the parties as foregone fee. Right. So there's your profit, right? No, Your Honor. Why? I didn't get it fully. The full fee would have been another $565,000, which made up my $7 million total claim. You were just saying, well, in effect, no one would take a deal in which they got 80% of their cost unless they had some other benefit. Well, the other benefit is the fee that's made part of the reimbursed cost, as I understand. A very small fraction because, in effect, what the Department of Energy was doing is, instead of the contractor absorbing 20% of the cost plus fee, he was only absorbing, say, 18% when you did the math because they were allowing the contractor to add fee in for purposes of then applying the 80% rate instead of just applying 80% to cost. So I agree with Your Honor. There was some very minor portion of our fee was recovered during performance as part of the cost share that we never made 100% of our cost during performance. We were getting reimbursed 82% when the math was done. So instead of absorbing 20% of the cost as a result of this foregone fee arrangement, we were only absorbing 18% of our cost. Does that make sense to Your Honor? For now. Well, you know, Yogi Bear said, you know, it's deja vu all over again, and that's how I feel today. I mean, I'm arguing basic government contract law principles. The late Professor John Semenuk, as I said two years ago, when I took my government contract courses at GW, he said that the only clause in federal contracting that actually is equitable for the contractor is the T4C clause. And I feel like the government in this case is just throwing that out the window. They're not looking at the equities of the situation. Number two, the problem with their argument is if you look at the very clause that's at issue here, R52-249-6, the title of the clause is termination cost reimbursement. Termination cost reimbursement. Because when you terminate a contract, whether it's a cost sharing agreement or a fixed price contract, there's a transformation. The contract becomes a cost reimbursement contract. And under a cost reimbursement contract, you get all costs reimbursable under the contract plus fee. Now, the government wants to make this argument that Section M. Now, that's the part that I don't quite understand as yet. Why is it the plus fee? It's all cost reimbursable. That's what we decided in the first opinion. If you look at FAR 52-249-6G4, it expressly states that in addition to all reimbursable costs, as part of the termination for convenience, the contractor is entitled to fee. It's expressly a part of the clause, and it was claimed as part of our termination for convenience settlement proposal. But even if you had that, that would still not be at 100% of the fee. It would still only be 80%. No, it would be 100% of our costs plus our fee at approximately 4.5% was our $7 million claim. That was our costs plus 4.5% to get to $7 million. The government paid us $5.5 million, so we contended we were doing round numbers of $1.5 million, and the government said, no, we only owe you $1 million because you don't get fee because of the cost sharing, no fee provision. And they rely upon— The $5 million was essentially 80% of the $7 million. Correct. That's what the contracting officer originally decided that the cost sharing applied, and he was only going to pay 80% of the $7 million. So what the government argues now is that this section M of FAR 52249-6 applies, which says the provisions of this clause relating to fee are inapplicable if this contract does not include a fee. Well, the contract doesn't include a fee when it was terminated for convenience because the cost sharing provisions no longer apply. And what's interesting about the government's brief is not once. Do they mention the title of the clause that says no fee? It says cost sharing no fee. I'll just ask, before I finish up here, one last thing you should ask yourself. If the government's right, put aside your prior decision that cost sharing and the cost sharing no fee provisions should be applied for termination for convenience because that's their argument. If that's the case, why is 52249-6 in the contract to begin with? It's superfluous. It gives it no meaning whatsoever because they're saying all the terms and conditions of the cost sharing agreement apply. And this provision on cost reimbursement, I mean, the title of the clause, termination cost reimbursement, gives it no meaning. Thank you. Mr. Courier. May it please the court. With all due respect, counsel is attempting to make mud out of this case by mixing and matching three different arguments. They have three separate arguments, and the only way to keep track of what they're saying is to keep firmly in mind what the three different arguments are. The first argument is that fee is recoverable as a cost, and that's section G1 of the termination for convenience clause. The second argument is that fee is recoverable as fee, and that's under G4 of the termination for convenience clause. Those are two separate clauses. The third argument is for reformation, which they like to call equity, and I'd like to address each one. Let's start with G4. G4 is about fee. Counsel, first of all, mischaracterizes it. It says that G4 makes fee recoverable in every case that there's a termination for convenience. Well, that's not so. The plain language of G4 says that fee is recoverable under a termination for convenience to the extent that fee is generally recoverable under the contract. Now, the logical implication of that is that if fee is not recoverable under the contract, you don't recover it. And in section M of the same termination for convenience clause simply reiterates that. It says, look, if there's no fee under the contract, you can't collect it under G4. They don't have a claim under G4 under the contract, but this court need not consider that issue as a matter of contract interpretation because the claim for fee as fee under G4 is clearly barred by the mandate of the previous decision. The scope of the mandate of the previous decision is the scope of the initial trial court decision. That's what Engel says where they had a chance to seek a refund for certain royalty payments that were made under a license agreement. They didn't do it when they appealed the first time. They tried to come back later, and the court said, too late. You can only appeal. You judge the scope of the mandate. They said, well, we didn't expressly raise it, so we don't care. The Tronzo decision, that's the same holding. You look to the scope of the initial decision. And it doesn't matter if you come up with a new legal theory later. That's what the Doe case says. It says, you look at the claim. If you made the claim and you had a chance to appeal from a decision related to that claim, that's all that matters. You look to the scope. So the claim for fee as fee is clearly barred by the mandate of the court. And as I pointed out at the start, the claim for fee as a matter of contract language is a loser even if they could get past the mandate because this contract didn't have any fee provision. Okay. Here's the tricky part. Several times in the briefs and in the arguments that counsel has made, counsel implies that G4 is merely a subsection of G1. In other words, that fee is a type of cost and that they can recover their fee as part of their reimbursable cost. And that's where he gets into a 7 million argument. That's his argument there, that 7 million is the amount of our cost, and so we can recover fee as part of our cost. Does that $7 million include the fee? No, it doesn't. So that's completely excluded. The $7 million is not an amount of incurred cost. Okay. The 7 – it's just a way of doing math. It's a poor way of doing math. What the agency said is basically we're going to give you 82%, 83%, 84% of your cost. That's basically what the provision means. But instead of doing that, they said we're going to give you 80%, plus for the purposes of calculating that 80%, we're going to add foregone fee as a deemed cost. It's just a way of doing the calculation. In other words, there's never any agreement to pay fee because the amount of your incurred cost is the only thing that's ever paid under the cost-sharing agreement. And it just changes the amount effectively to 82% or 83% or 84%. But in one of these – I'm sorry. Were you still spelling out this point in response to Judge Marshall? Right, because if you look at what the contracting officer's decision is, he says the 7 million – he's applying the cost-share agreement. And the cost-share agreement, effectively what it did – you never got paid fee because you never even got paid all of your cost. The cost-sharing agreement, the most you ever got paid – the trial court says you got paid 84% of your cost. Today, Mr. Simon says you effectively got paid 82% of your cost. I don't know what the exact amount of the figure is. It is somewhat more than 80%. Well, here's what I don't understand. And perhaps this is something that you can explain in terms of the broad utilization of cost-sharing contracts in what context. Set aside for the moment the potential of getting patent rights that was at issue in this case at the outset. What is the incentive on the part of the contractor to enter a contract in which the contractor may get 80% of his costs? I mean, why isn't he losing 20% on the deal? I do want to address this, and I think I made a mistake in the last case in not addressing this point because this really basically is – In other words, my real question is, is profit folded in to these so-called costs? No. Setting aside for it on fee. Okay. And what's the incentive to the contractor in this situation? The contract – and I like to go back to what the court held in the last decision. Counsel for Jacob suggests that the court said last time, that wasn't a fair agreement. That's why we're giving you 100% of the cost. I don't know what was going on in people's minds when they thought about the case, but that's not what the decision says. The decision says that under these circumstances, we don't believe that cost was referring to the amount of cost. We think it was just referring to the type of cost. And in reaching that decision, the court relied upon the fact that in several other instances where they wanted to make sure that the amount, the 80% figure came through, that they specifically referenced that. Okay. That's the holding. Okay. And that's a limited holding, and it goes to the definition of cost. Under no circumstances does that holding support what Mr. Simon is asking for today. I'm still waiting for an answer to the question. Okay. What is in – what's in it for a contractor? Right. Not with respect to this particular case, but just globally. I think that there's an enormous factual record that would have to be built to support why people go into these kinds of very complicated agreements. Well, give me a sense, because frankly, it looks strange. And unless there's some kind of fairly quick explanation, the profits are built in? The profits are elsewhere. The profits are not in what you're being paid by the government. Is it because you're going to get to manage the plant or whatever down the road? There are – yes. Well, there is that factor. There is the potential that coal gasification might be extremely valuable technology. There's a whole host of economic considerations. The program was mandated by Congress because it was unfair to simply reimburse all of their costs and then let the Congress – – enormous benefits. In – – to go into all the motives that the various parties have for these contracts because it's a huge subject. These are very big and complicated contracts. The nature of the patent rights was very, very poorly explained, and it was explained to me before I got to the argument that there were a number of aspects. There's a lot of benefits. The economic reasoning for why the corporation before Jacobs, by the way, which was Serene, which is the company that made the decision to go into the agreement. There is no record of all the different reasons that the people had for going into this agreement. What there is is a written agreement with very clear terms, and I think as a matter of contract interpretation, you have to enforce the contract as written. Okay, does it come down to this that if you have a cost-sharing contract and there's a termination for convenience of the government, you're going to take a bath if you're the contractor? Not necessarily because you don't know what benefits they've got from what they've learned. Let's assume that the benefits were all backloaded. They were going to be after the plant was built or after the technology was developed. If you don't have any of those potential benefits that have accrued, then you've just contributed 20% of the cost of something and gotten nothing out of it. I don't know whether they got nothing out of it. I don't care about this case. I'm asking you in general. I think it's important, Your Honor. I think it's important that I want to know what the general position of the government is. The general position is that this contract, and this is a point that was overlooked in the earlier decision, had limitation of funds clauses that made it express in the contract that at every step of the way, there was a good possibility that the contract wasn't going to proceed. Well, you've come back to this contract. I would like an answer to the question of what in general is your position with respect to cost-sharing contracts in which there's a P4C that occurs before the potential accrual of the benefits that the contractor may have had in mind. Do they lose money in all of those cases in your view? Your question, Your Honor, with all due respect, assumes that the benefits only come at the end. I don't know that. It does. That was not an assertion. It was an express part of the question. If that's the assumption, the answer is that the contractor makes a judgment before entering into the contract. If their judgment is that there will only be benefits at the end, they make a judgment whether it's worth the risk given all the things that they know about what the government needs, about what the economy is going to do, what the need is going to be for this kind of technology. They make the decision before they enter into the contract that this is a worthwhile and beneficial arrangement for them. The government shares the risk. In other words, the government is underwriting research that is going to be for the benefit of the contractor and paying 80%. And we don't know whether we'll ever get anything back from that. But we put in our 80%. But that's always true in T4C situations. The government typically comes out with nothing. Well, it's not a surprise, I think it's fair to say, to the contractors. When you call something a cost-share agreement, that it's a cost-share agreement and that you don't know when it's research whether or not – or exactly what the results of the research are going to be. It's the nature of the beast. It's the nature of the contract. And there's no reason to go back. If the contract doesn't turn out to be as lucrative as you expected, that you go back and rewrite the terms. This case, it's very clear that fee was not a cost. The contractor understood that. If you look in the joint appendix at pages 245 and the following three pages, those are all part of their settlement proposal. Costs and fee are separately identified. The contractor never thought that fee was a cost. They separately identify fee and cost. But does the fee become a cost once the contract is terminated for convenience? No. Isn't that the issue? Is that what they're trying to say? That is what they're trying to say. And in trying to say that, the irony is that they are relying on the concept of foregone fee, which is simply a factor in the cost-sharing provision. The real irony of this case is in the first appeal, Jacobs came here and said you cannot read together the cost-sharing provision with the termination for convenience provision on what's an allowable cost. Today, they're back here saying that you have to read together the section G1 of the termination for convenience with the cost-sharing provision. Because the cost-sharing provision and its definition of foregone fee is their only hook for any kind of fee concept in the contract. So the irony is that the party that has diametrically shifted its position in this appeal is Jacobs. Thank you. Thank you. Senator? First, Your Honor asked what is the incentive for this contract? And I think there's no better place to look than Joint Appendix 54. It's the contracting officer's final decision. And there he recited Jacobs' contention that it agreed to cost-sharing and a no-fee provision on the assumption it would complete the contract and receive the benefit of the bargain. And the court recognized in its prior decision at page 3 that the benefit of the bargain was advanced patent rights. It said at page 3, the contract also authorized the contractor to discontinue the project after phase 1 was completed if it did not receive those advanced patent rights. And you need to complete, you need to perform in order to get to the position where you have a patent or a patent availability. They only performed 25% of this contract. But is the real crux of your argument then, Mr. Simon, that because the contract was terminated for convenience, since we did not receive the ultimate benefits at the tail end of the contract, that we should receive a fee allocation as a cost? It's not a cost. But you're right. It's not a cost. It's a fee. And let me speak to that. If you turn to Joint Appendix 55, which again is the contracting officer's final decision, he outlines our claim. And he keeps mixing, counsel for the government mixes performance with a termination. This termination claim follows 52-249-6 precisely. G1 is all costs reimbursable under the contract. G2 is termination settlement proposals. G3 is the reasonable cost of settlement. And G4 is fee. And that's exactly how we follow the cost reimbursement termination provision. That was our proposal. That's what we followed. And you want to talk about irony. The irony here is that the mandate of this court should be that the cost sharing provisions do not apply. That's what you said the first time around. And they're saying it does still apply. And throughout their brief, it's 40 pages. For 30 pages, they focus in on this mandate rule. But not once do they harmonize how cost sharing no fee still applies. How could that apply? Thank you. Thank you. The case is submitted.